UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br> v.<br><br>SEAN D. SULLIVAN,<br><br>     Defendant. | CASE NO. CR18-5273 BHS<br><br>ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS AND SEVER |

This matter comes before the Court on Defendant Sean Sullivan's ("Sullivan") motions to suppress and to sever. Dkt. 102. The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby denies the motions for the reasons stated herein.

### I. FACTUAL BACKGROUND

**A. Sullivan's Arrests and Charges**

The indictment charges Sullivan with three counts: one count of production of child pornography in violation of 18 U.S.C. § 2251(a) and (e) ("Count 1")[1]; and two

---

[1] The Government states that it "has elected to pursue solely an attempt theory with respect to Count 1." Dkt. 87 at 2.

counts of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) ("Count 2" and "Count 3"). Dkt. 16. The complaint alleges that Kassandra Jeffers, the mother of the alleged minor victim ("MV1") of Count 1, reported discovering nude photos of MV1 on Sullivan's black LG smartphone on July 24, 2017. Dkt. 1 at 3, 4. On July 25, 2017, Cowlitz County law enforcement searched Sullivan's home pursuant to a warrant and seized an Alcatel One Touch cell phone but could not locate the black LG phone described by Jeffers. *Id*. at 5. On July 26, 2017, Detective Riley McNeal ("McNeal") arrested Sullivan, seizing a Motorola G4 Play cell phone that Sullivan admitted possessing. *Id*. One photo of MV1, which in part underlies Count 1, and photos of additional minors, which underly Count 2, were found on this phone and/or in one of two Google accounts associated with the phone.[2] After Sullivan's arrest and detention in July 2017, he was released on bond to obtain in-patient drug treatment at the Drug Abuse Prevention Center (DAPC) in Castle Rock, Washington. *Id*. at 7. On November 20, 2017, Sullivan was arrested after DAPC staff found a blue LG cell phone under Sullivan's mattress that contained images of nude children. *Id*. The phone was imaged and searched pursuant to a warrant, and images found upon it form the basis for Count 3.

---

[2] Sullivan previously moved to suppress the materials seized pursuant to the various device warrants and the warrants issued to Google; the Court denied the motion on May 7, 2019. Dkts. 51, 88.

**B.    July 26, 2017 Post-Arrest Interview**

After Sullivan's July 26, 2017 arrest, McNeal interviewed him at the Cowlitz County police station. Dkt. 102-1.[3] Sullivan gave McNeal permission to record the interview, and McNeal advised Sullivan of his *Miranda* rights. *Id.* at 2. Sullivan responded that he understood those rights, *id.*, and when asked whether he wished to speak with McNeal, responded "about what?" *Id.* at 3. McNeal explained that he needed to read Sullivan his rights and Sullivan responded "yeah." *Id.* After some discussion of Sullivan's residence and family situation, McNeal asked whether Sullivan had any girlfriends. The following discussion took place:

> SULLIVAN: No, I—I know a few girls, if that's what you're getting at. Uh—
> McNEAL: Who—who are they?
> SULLIVAN: You know what, I'm—I'm done. I don't want to answer questions. I'm not going to sit here and talk about other—
> McNEAL: Well, I—I—okay.
> SULLIVAN: —people that aren't here.
> McNEAL: Well, I'm not—I'm not here to—I'm not here to like get into your personal life, but—
> SULLIVAN: But you're here to get in my personal life.
> McNEAL: But I'm not.
> SULLIVAN: I know—I know how it goes, bud. I'm not dumb.

*Id.* at 5.

After some further discussion regarding the circumstances of Sullivan's arrest, the parties had the following exchange:

> McNEAL: . . . So—do you want to continue this interview?

---

[3] The cover page of the transcript of this interview is dated July 25, 2017, but the parties agree that the interview actually took place on July 26, after Sullivan's arrest. Dkt. 102 at 3 n.1; Dkt. 110 at 3 n.2.

ORDER - 3

|    |                                                                                                                                                                                       |
|----|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 1  | SULLIVAN: No.                                                                                                                                                                         |
|    | McNEAL: No, you don't want to continue it?                                                                                                                                            |
| 2  | SULLIVAN: No.                                                                                                                                                                         |
|    | McNEAL: Okay. Well, I'm going to end it then.                                                                                                                                         |
| 3  | SULLIVAN: I mean, I don't –I don't understand why you're asking me questions.                                                                                                         |
| 4  | McNEAL: Well, I—I—well, I'm going to –                                                                                                                                                |
|    | SULLIVAN: I've got a DOC warrant.                                                                                                                                                     |
| 5  | McNEAL: Okay, well, that's not what I'm investigating.                                                                                                                                |
|    | SULLIVAN: Okay. Well, no one's told me what you're investigating, so.                                                                                                                 |
| 6  | McNEAL: Okay, well I'm—I was trying to get to that. But you—if you want to talk to me, I'll talk to you. If not—                                                                      |
| 7  | SULLIVAN: You can talk all you want. It doesn't mean I'm going to answer every question.                                                                                              |
| 8  | McNEAL: Okay, so do you want me to continue talking to you?                                                                                                                           |
|    | SULLIVAN: Sure.                                                                                                                                                                       |
| 9  | McNEAL: Okay.                                                                                                                                                                         |
|    | SULLIVAN: Just because, you know, I'm curious what—what you're                                                                                                                        |
| 10 | investigating because I haven't done anything. But we'll see what you got to say here.                                                                                                |

*Id*. at 8–9.

Sullivan then answered several questions regarding his acquaintance with Jeffers. After McNeal asked the age of Jeffers' child, the following exchange occurred.

> SULLIVAN: You know what, I'm –I'm not going to sit here and run [K]assandra's life down to you. You can get all that from her, so.
> McNEAL: Okay, but she—she has a kid.
> SULLIVAN: I'm done. I don't want to talk anymore.

*Id*. at 10.

McNeal then announced that Sullivan was under arrest "for a litany of sex offenses." *Id*. Sullivan reacted with surprise, and McNeal identified the charges against Sullivan as his "DOC warrant," obstructing and "some sex offenses." *Id.* After McNeal identified the sex offense as possession of child pornography, the following discussion took place:

ORDER - 4

> SULLIVAN: —I go to the nudist websites and look at nudist pictures, but they're legal. There's no sexual acts.
> McNEAL: Are there kids in them?
> SULLIVAN: Yeah.
> McNEAL: There's kids in the naked pictures?
> SULLIVAN: There's—there's whole families together. And I—
> McNEAL: Why do you look at nudist stuff with kids?
> SULLIVAN: Because I'm a nudist.

*Id*. at 12. After some further discussion, McNeal asked whether there would "be anything like that on your phone?" Sullivan then stated he was "done," and the interview terminated. *Id*.

### C. December 6, 2017 Interview

A few weeks after Sullivan's November 2017 arrest, he was transferred to the SCORE jail in Des Moines, Washington, where he was interviewed by Detective Lorenzo Gladson ("Gladson") on December 6, 2017. Gladson obtained Sullivan's consent to record the interview and advised Sullivan of his *Miranda* rights. Dkt. 102-3 at 2. Sullivan signed a written waiver. *Id.* at 3; Dkt. 110-1. Gladson began asking Sullivan about the cell phone that was found at DAPC, asking what kind of phone it was. The following exchange occurred:

> SULLIVAN: I don't –I don't know. I bought—I bought a cell phone and I just it one time to make one call. And the guy I was rooming with used it. And another guy that was at the facility used it. That was it. They took it, so—
> GLADSON: They took it?
> SULLIVAN: —I've got an attorney. And I—I don't—you haven't even said what this is about, so.
> GLADSON: Well, so this is about your phone that you had at DAPC.
> SULLIVAN: What's wrong with my phone?
> GLADSON: The phone that you—what's wrong with it? It had child pornography on it.

1 | Dkt. 102-3 at 4.

2 | Sullivan then denied that there was child pornography on the phone, while
3 | Gladson insisted that there was. Sullivan then explained:

> SULLIVAN: There is no child porn. There is nudist pictures which are not illegal, okay. And—and there—there is no kids or—or young adults, or anything else doing sexual activity on that phone.
> GLADSON: Well, how'd the nudist pictures get on there that are—are not children?
> SULLIVAN: It—they're not illegal. It doesn't matter.
> GLADSON: It doesn't matter?
> SULLIVAN: No. They're—they're not illegal. I –I can be a nudist. That's fine.

*Id.* at 7. The parties continued to discuss whether the phone contained child pornography, then had the following exchange:

> SULLIVAN: —to my knowledge, there's none on there. I don't think you're even right on that.
> GLADSON: Well, it's—there's not just—
> SULLIVAN: But I've got an attorney. Just talk to him. Because I—I— there is no child porn on there.
> GLADSON: Are you invoking your right to an attorney at this time?
> SULLIVAN: I am. I've got an attorney already. As you just said, I'm supposedly out on child porn charges already.
> GLADSON: Okay.
> SULLIVAN: So you know I've got an attorney.
> GLADSON: Okay. That doesn't mean that this—that doesn't mean that you can't talk to me on a new case. This is a separate—this is a separate case.
> SULLIVAN: Right.
> GLADSON: Okay.
> SULLIVAN: But you keep saying that I got child porn on this phone and I don't have any child porn on that phone.
> GLADSON: I'll tell you again that you do, just like this wall is white.
> SULLIVAN: All right. There's none—to my knowledge, there is no child porn on that phone.
> GLADSON: Okay. Well, you've—I can't ask you any more questions because you've—
> SULLIVAN: All right.

>GLADSON: —invoked your right to an attorney. And you're going to go back to the Cowlitz County Jail and be booked on new child porn charges.

*Id.* at 9. After a short exchange in which Gladson reaffirmed the new charges and confirmed Sullivan had nothing else to add, Gladson then terminated the interview. *Id.* at 10.

## II. PROCEDURAL HISTORY

On February 27, 2020, Sullivan filed his motion, seeking to suppress the statements he made to law enforcement on July 26, 2017 ("July Statement") and on December 6, 2017 ("December Statement"), and seeking the severance of each of the three counts. Dkt. 102.[4] Sullivan's motion also seeks permission to file an overlength brief and to seal the declaration accompanying the motion. *Id.* at 1. On March 12, 2020, pursuant to an extension granted by the Court, the Government filed its response. Dkts. 106, 110. On March 19, 2020, Sullivan filed his reply.[5] Dkt. 113.

## III. DISCUSSION

**A.   Motion to Suppress**

Sullivan moves to suppress the July Statement and the December Statement, both of which he made to law enforcement after his arrests. Dkt. 102 at 1. A defendant's

---

[4] Sullivan also sought a continuance of the trial date, which the Court granted in a separate order. Dkt. 109.

[5] Sullivan's reply states that he did not request oral argument in light of the General Orders of this Court arising out of the COVID-19 pandemic, and "ha[s] no objection to these motions being decided on the briefing." Dkt. 113 at 1. The Government has not sought a hearing. The Court agrees that this matter is appropriate for resolution on the briefing.

1   custodial[6] statement may be admitted only if he made a knowing, intelligent and

2   voluntary waiver of his rights.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  A waiver

3   may be express or implied, but the Government has the burden of proving such a waiver

4   by a preponderance of the evidence.  *See United States v. Younger*, 398 F.3d 1179, 1185

5   (9th Cir. 2005).  The defendant must be aware of "'the nature of the right being

6   abandoned and the consequences of the decision to abandon it.'"  *Id.* (quoting *United*

7   *States v. Garibay,* 143 F.3d 534, 536 (9th Cir. 1998)).

8         The parties do not dispute, and the record is clear, that Sullivan received *Miranda*

9   warnings before both interviews.  Dkt. 102-1 at 2; Dkt. 102-3 at 2.  Rather, the question is

10  whether Sullivan waived his rights or, after waiving them, revoked his consent.  The

11  Court considers the totality of the circumstances, including a defendant's background,

12  experience and conduct, in determining whether a statement was voluntary and

13  constitutes a waiver.  *Younger*, 398 F.3d at 1186 (citing *Garibay,* 143 F.3d at 536).

14  Relevant factors include: "(i) the defendant's mental capacity; (ii) whether the defendant

15  signed a written waiver; (iii) whether the defendant was advised in his native tongue or

16  had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether

17  the defendant's rights were individually and repeatedly explained to him; and (vi)

18  whether the defendant had prior experience with the criminal justice system." *United*

19  *States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007) ("*Crews*").

---

[6] The Government disputes that Sullivan's statements were "custodial" but argues that the issue need not be decided because Sullivan waived his *Miranda* rights.  Dkt. 110 at 8 n.3.  For purposes of this motion, the Court assumes without deciding that Sullivan's statements were custodial.

### 1. July Statement

Sullivan argues that the July Statement should be suppressed because he did not expressly waive his *Miranda* rights and was questioned after invoking his right to remain silent. Dkt. 102 at 11. The Government argues that Sullivan either expressly or impliedly waived his rights and that it was Sullivan himself who resumed the interview each time he appeared to revoke his consent. Dkt. 110 at 10–11.

The Court agrees with the Government. Sullivan acknowledged that he understood his *Miranda* rights. Dkt. 102-1 at 2 (McNeal: "Do you understand those rights?" Sullivan "Yep."). When asked "having those rights in mind, do you wish to talk to me?" Sullivan responded with a question: "about what?" Dkt. 102-1 at 2–-3. After McNeal explained that he needed to read Sullivan his rights, Sullivan responded "yeah." *Id*. at 3. Even if Sullivan's "yeah" is not interpreted as express consent, his "about what?" response requested further dialogue; at a minimum, it constitutes an implied waiver. *United States v. Rodriguez–Preciado,* 399 F.3d 1118, 1127, *amended,* 416 F.3d 939 (9th Cir. 2005) ("A suspect may impliedly waive the rights by answering an officer's questions after receiving *Miranda* warnings."). In addition, with the exception of the lack of a written waiver, all of the factors identified in *Crews* support the Government's argument that Sullivan's waiver was knowing and voluntary. Sullivan does not argue and there is no indication that he has a diminished mental capacity. It is clear from the recording of the interview that Sullivan is a fluent English speaker. Dkt. 111. Sullivan clearly stated that he understood his rights, which were individually explained to him. Dkt. 102-1 at 2. Finally, Sullivan is a former police officer and police chief in multiple

locations and thus is extraordinarily familiar with law enforcement. Dkt. 77 at 16, 17. Under the totality of the circumstances, Sullivan's waiver of his *Miranda* rights was sufficiently knowing and voluntary.

*United States v. Rodriguez,* 518 F.3d 1072 (9th Cir. 2008), cited by Sullivan, is inapposite. There, the court held the defendant's response after hearing his rights ("I'm good for tonight") was ambiguous: it could either mean the defendant was "good" with being questioned, or that he did not consent. *Id*. at 1077. Under such circumstances, it was incumbent upon the officers to seek clarification. Here, Sullivan—a former police officer with considerable law enforcement experience—initiated and continued dialogue after receiving *Miranda* warnings. "Continuing to respond to questioning . . . constituted an implied waiver." *Younger*, 398 F.3d at 1186.

Sullivan next argues that he "repeated[ly]" attempted to stop the interview. Dkt. 102 at 11. The transcript and recording of the July Statement demonstrate otherwise. Until Sullivan's final statement that he was "done" (Dkt. 102-1 at 12), after which McNeal terminated the interview, Sullivan continually re-started the dialogue after appearing to revoke his consent. In the first instance, Sullivan announced he was "done," then proceeded to initiate a lengthy discussion of the manner of his arrest. Dkt. 102-1 at 5, 6–8. Following that discussion, McNeal asked whether Sullivan wanted "to continue this interview"; Sullivan responded "no," but then asked why McNeal was conducting the interview. *Id*. at 8. Before proceeding further, McNeal obtained an express clarification of Sullivan's consent:

> McNEAL: . . . if you want to talk to me, I'll talk to you. If not—

>SULLIVAN: You can talk all you want. It doesn't mean I'm going to answer every question.
>McNEAL: Okay, so you want me to continue talking to you?
>SULLIVAN: Sure.

*Id*. at 9.  After McNeal asked about Jeffers' child, Sullivan again announced "I'm done. I don't want to talk anymore." *Id*. at 10.  But once again, Sullivan re-initiated the conversation with a series of questions about his charges.  *Id*. at 10–11.  In each instance after Sullivan invoked his right to silence, he immediately re-initiated the conversation; such action constitutes a waiver.  *Hendricks v. Vasquez*, 974 F.2d 1099, 1105, (9th Cir. 1992), *as amended on denial of reh'g* (1992) (while interrogation must cease after a suspect's invocation of his right to remain silent, "the interrogators may recommence questioning if the suspect initiates the conversation.").

      Similarly, after McNeal stated that Sullivan was under arrest for possession of child porn, Sullivan initiated a conversation explaining that the images were nudist pictures.  They briefly discussed the content of the pictures and then McNeal asked whether such pictures would be on Sullivan's phone.  At that point, Sullivan said he was done and McNeal stopped questioning him.  Sullivan's initiation of the conversation constitutes a waiver of his right to remain silent.  *Id.*  Therefore, the Court denies Sullivan's motion to suppress the July Statement.

**2.     December Statement**

Sullivan signed an express waiver before making the December Statement. Dkt. 110-1.[7] However, Sullivan contends that the December Statement should be excluded because the interview was not terminated after he stated that he had an attorney. Dkt. 102 at 12. The Government argues that Sullivan's post-waiver references to having an attorney in another matter were ambiguous and equivocal, and thus did not require cessation of questioning. Dkt. 110 at 12-13.

An accused who invokes the right to counsel cannot be questioned unless an attorney is present or "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–85 (1981). Whether an accused has "'*actually invoked* his right to counsel'" is an objective inquiry. *Davis v. United States,* 512 U.S. 452, 458 (1994) (adding emphasis and quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam)). At a minimum, invocation of the right to counsel requires "'some statement that reasonably can be construed to be an expression of a desire for the assistance of an attorney.'" *Paulino v. Castro,* 371 F.3d 1083, 1087 (9th Cir. 2004) (quoting *McNeil v. Wisconsin,* 501 U.S. 171, 178 (1991)). An invocation must be made "unambiguously": a request that is "'ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the

---

[7] Sullivan's opening brief argued that Sullivan might not have expressly waived his *Miranda* rights. Dkt. 102 at 12. However, the Government's response attached Sullivan's written waiver, Dkt. 110-1, and Sullivan's reply concedes that Sullivan initially waived his rights. Dkt. 113 at 6.

suspect *might* be invoking the right to counsel . . . do[es] not require the cessation of questioning.'" *Younger*, 398 F.3d at 1187 (quoting *Davis*, 512 U.S. at 459).

Sullivan's initial reference to having an attorney was ambiguous and equivocal, and in addition was followed by his own re-initiation of the dialogue. After stating "I've got an attorney," Sullivan immediately stated that Gibson had not "even said what this is about." Dkt. 102-3 at 4. Gibson responded that the interview was "about your phone that you had at DAPC" and Sullivan asked, "what's wrong with my phone?" *Id*. at 4. At most, the mention of an attorney could suggest that Sullivan "*might* be invoking the right to counsel," which does "not require the cessation of questioning." *Younger*, 398 F.3d at 1187. But Sullivan himself immediately "initiate[d] further communication." *Edwards*, 451 U.S. at 485. This resumption of dialogue renders Sullivan's reference to an attorney even more ambiguous and equivocal; a reasonable officer would not have understood his statement to be "an expression of a desire for the assistance of an attorney." *Paulino,* 371 F.3d at 1087.

When Sullivan next mentioned an attorney, Gladson confirmed Sullivan's intention to invoke his right to counsel. Dkt. 102-3 at 8–9. Gladson ceased his questioning and, after responding to some additional comments from Sullivan, explained that Sullivan was under arrest on new child pornography charges. *Id*. at 9–10. No questioning took place after Sullivan confirmed he was invoking his right to counsel. Sullivan is not entitled to suppression of the December Statement.[8]

---

[8] Sullivan's motion also cites Rules of Professional Conduct 4.2, prohibiting a lawyer from communicating with a party known to be represented by counsel regarding the subject of

**B.     Motion to Sever**

Sullivan argues that all three of the counts in his indictment should be severed or, at a minimum, that Count 1 (production/attempted production of child pornography) should be severed from Counts 2 and 3 (possession of child pornography). The Government contends that all three counts were properly joined pursuant to Fed. R. Crim. P. 8(a), and that they should not be severed pursuant to Fed. R. Crim. P. 14. The Court agrees that the three counts were properly joined and should not be severed.

**1.     Joinder Pursuant to Fed. R. Crim. P. 8**

Joinder of offenses is proper if the offenses are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). This Rule is "broadly construed in favor of initial joinder." *United States v. Jawara*, 474 F.3d 565, 573 (9th Cir. 2006). In evaluating whether counts are of the same or similar character, the Ninth Circuit considers "factors such as the elements of the statutory offenses, the temporal proximity of the acts, the likelihood and extent of evidentiary overlap, the physical location of the acts, the modus operandi of the crimes, and the identity of the victims." *Id*. at 578. "[T]he bottom line is that the similar character of the joined offenses should be ascertainable—either readily apparent or reasonably inferred—from the face of the indictment." *Id*.

---

the representation. Sullivan cites no authority applying this rule of conduct to non-attorney law enforcement officers. The Supreme Court has rejected the notion that standards established by a professional organization for the conduct of its members could be "controlling in interpretation of constitutional provisions." *Texas v. Cobb*, 532 U.S. 162, 171 n.2 (2001).

1      Sullivan contends that joinder is improper because the counts have different
2 elements, relate to different electronic devices and arise out of different periods of time.
3 Dkt. 102 at 14; Dkt. 113 at 7–8.  The Government argues that it is quite common for
4 child pornography crimes to involve multiple devices and that the timeframes involved in
5 this case support joinder.  Dkt. 110 at 15–16.
6      The counts are properly joined.  While the elements of the production and
7 possession charges differ, the crimes are of similar character.  The Ninth Circuit has
8 affirmed the joinder of considerably less similar offenses.  *See*, *e.g.*, *United States v.*
9 *Fiorillo*, 186 F.3d 1136, 1145 (9th Cir. 1999) (charges for wire fraud, violation of
10 Resource Conservation and Recovery Act and receiving explosives without a permit were
11 properly joined).  Other circuits have readily found that crimes involving exploitation of
12 minors, including production and possession of child pornography, are properly joined.
13 *United States v. Reynolds*, 720 F.3d 665, 669–70 (8th Cir. 2013) (charges of enticement
14 of a minor to engage in illicit sexual activities, receiving child pornography, and
15 production of child pornography were properly joined even though different victims were
16 involved); *United States v. Little*, 864 F.3d 1283, 1289 (11th Cir. 2017) (counts for
17 possession and transportation of child pornography were properly joined because they
18 used the same email account and represented acts of a similar character); *United States v.*
19 *Rivera*, 546 F.3d 245, 253–54 (2d Cir. 2008) (five counts for enticement, interstate travel
20 and production of child pornography relating to four minor victims over a five month
21 period were properly joined).
22

1    While Sullivan is charged with using multiple devices, some of the images
2 underlying Counts 1 and 2 are alleged to have been stored in an online Google account
3 assigned to the same email address.  Dkt. 1 at 6; Dkt. 76 at 4.  Thus, while accessible
4 through different devices, at least some of the images at issue are alleged to have been
5 stored in a common location.  Furthermore, the timeframes of each offense are close,
6 even overlapping:  Count 1 alleges production of child pornography "in or about 2017";
7 Count 2 alleges possession "continuing until in or about July 2017," and Count 3 alleges
8 possession between July and November 2017.  Dkt. 16 at 1–2.  This time period does not
9 involve gaps of time that the Ninth Circuit has deemed excessive.  *See, e.g.*, *United States*
10 *v. Rousseau*, 257 F.3d 925, 932 (9th Cir. 2001) (affirming joinder of firearm possession
11 counts occurring nine months apart).  The alleged acts involve similar *modus operandi*—
12 the creation or collection of images of nude children in cloud-based storage linked to a
13 common email address.  Finally, as discussed below, there is a likelihood of overlapping
14 evidence.  Thus, the factors identified in *Jawara* support joinder.  474 F.3d at 573.

15    **2.    Severance Pursuant to Fed. R. Crim. P. 14**

16    Sullivan argues that, even if properly joined, the counts should be severed for trial
17 because the evidence for Count 1 is "weak" and the jury could be improperly swayed in
18 deciding that count by the evidence pertaining to the possession counts.  Dkt. 102 at 14;
19 Dkt. 113 at 8.  The Government responds that the evidence would be cross-admissible
20 and overlapping and that any potential for prejudice can be addressed by an appropriate
21 jury instruction.  Dkt. 110 at 17-20.

Fed. R. Crim. P. 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." A court should sever charges "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Specifically, "[t]he test is whether joinder is so manifestly prejudicial that it outweighs the dominant concern with judicial economy and compels the exercise of the court's discretion to sever." *United States v. Brashier*, 548 F.2d 1315, 1323 (9th Cir. 1976). The burden is on the defendant to demonstrate clear, manifest, or undue prejudice because of joinder. *See United States v. Adler*, 879 F.2d 491, 497 (9th Cir. 1988). When evidence would be cross-admissible in separate trials anyway, there is no prejudice in failing to sever counts. *See, e.g.*, *United States v. Johnson*, 820 F.2d 1065, 1070 (9th Cir. 1987) ("If all of the evidence of the separate count would be admissible upon severance, prejudice is not heightened by joinder.").

The Government argues that evidence would be cross-admissible pursuant to Fed. R. Evid. 414, which provides that "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation." The Rule defines "child molestation" as, *inter alia*, conduct involving violation of specified statutes, including the statutes whose violation is charged in the three counts asserted against Sullivan. Fed. R. Evid. 414(d)(2)(B) ("molestation"

includes "any conduct prohibited by 18 U.S.C. chapter 110").[9]  Sullivan's reply argues that Rule 414's applicability should be limited to prior convictions and should not be applied to evidence of other alleged conduct.  Dkt. 113 at 8-9.  Sullivan cites no authority for such a limitation, instead merely noting that in some of the cases cited by the Government the evidence at issue was a prior conviction.  *Id.*

There is no basis for the limitation Sullivan suggests.  Rule 414's reference to evidence that a defendant "committed any other child molestation" nowhere contains any limitation that the molestation be grounded in a criminal conviction.  The Ninth Circuit has disclaimed any such requirement.  *United States v. LeMay*, 260 F.3d 1018, 1029 (9th Cir. 2001) ("we do not suggest that district courts may *only* introduce prior acts of molestation for which a defendant has been tried and found guilty.").  Instead, courts have applied Rule 414 to evidence of other charged, or even uncharged, acts.  *See, e.g. United States v. McCormack*, 700 F. App'x 643, 645 (9th Cir. 2017) (in trial for sexual exploitation and kidnapping, Rule 414 permitted introduction of evidence showing uncharged conduct regarding defendant's offer to exchange child pornography); *Rivera,* 546 F.3d at 254 ("spillover" of evidence from multiple charges is "specifically sanction[ed]" by Rule 414 and thus did not support severance); *Reynolds*, 720 F.3d at 670

---

[9] Sullivan states that he "objects" to "this expansive definition of 'molestation,'" Dkt. 113 at 8, but cites no authority contradicting the plain meaning of the language of Rule 414(d)(2). *See United States v. Foley*, 740 F.3d 1079, 1087 (7th Cir. 2014) ("For purposes of [Rule 414], an offense of 'child molestation' includes the production of child pornography, . . . as well as the possession, receipt, and distribution of child pornography.")

ORDER - 18

1  (rejecting argument that charges relating to different victims should have been severed,
2  because testimony of each victim would have been admissible in separate trials).

3  Because a defendant does not suffer prejudice from a joint trial if evidence of the
4  count he seeks to sever would be admissible at the trial for the remaining counts,
5  severance is not warranted here. *Johnson*, 820 F.2d at 1070.  Furthermore, to the extent
6  that Sullivan might suffer potential prejudice from the joinder of the charges, the Court
7  concludes that it appears at this stage that any such potential prejudice could be
8  adequately addressed with appropriate limiting instructions. *See Zafiro*, 506 U.S. at 539
9  (explaining that "limiting instructions[] often will suffice to cure any risk of prejudice"
10 contemplated by Rule 14).  The parties have proposed such an instruction.  Dkt. 71 at 33.
11 This "militates against a finding of prejudice." *Rousseau*, 257 F.3d at 932.  Sullivan's
12 request for severance is accordingly denied.

13 **C.     Remaining Motions**

14 Sullivan has also moved to seal the declaration of Phil Brennan, Dkt. 103, and
15 requests leave to file a single brief exceeding the length permitted by the Local Rules
16 because he combined three motions into one.  Dkt. 102 at 1.  The Court finds that
17 Sullivan's motion to seal seeks to protect sensitive information and therefore finds good
18 cause to grant the motion.  The Court likewise finds that Sullivan's combination of three
19 motions into one brief justifies exceeding the page limits of the Local Rules and therefore
20 grants Sullivan's request for leave to file an overlength brief.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that Sullivan's motions to dismiss and to sever, Dkt. 102, are **DENIED**.  Sullivan's motions to seal and to file an overlength brief, also contained in Dkt. 102, are **GRANTED**.

Dated this 2nd day of November, 2020.

BENJAMIN H. SETTLE
United States District Judge